IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REIVIA ASHLEY, LLC | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 14-5092 |
| PASELO LOGISTICS, LLC, ET AL. | : | |

**MEMORANDUM**

**SURRICK, J.**                                                   DECEMBER  1 , 2017

## I.    INTRODUCTION

On September 5, 2014, Plaintiff Reivia Ashley, LLC filed a Complaint alleging a claim

for breach of contract against Defendant Paselo Logistics, LLC, and claims for conversion and

an accounting against Paselo and co-Defendants Angelo Franco, Pasquale Scalleat ("P.

Scalleat") and Maria Scalleat ("M. Scalleat").  (Compl., ECF No. 1.)

Reivia alleges that Paselo breached the loan agreement pursuant to which Reivia financed

Paselo's purchase of the 22-plus-acre site of a former coal processing facility known as the

Huber Ashley Breaker, in Ashley, Pennsylvania ("Huber Breaker").  (*Id.* ¶¶ 63-69.)  Reivia

further alleges that Defendants improperly diverted and withheld from Reivia substantial revenue

from the Huber Breaker scrap metal and material recycling project.  (*Id.* ¶¶ 70-78.)

Concurrently with the filing of its Complaint, Reivia filed a Motion for a Temporary

Restraining Order and a Preliminary Injunction seeking to enjoin Defendants from entering on or

removing anything from the Huber Breaker property, and to freeze the Paselo bank accounts at

issue in this dispute.  (ECF No. 2.)  On September 5, 2014, we granted the requested TRO and

scheduled a hearing on Plaintiff's Motion for Preliminary Injunction.  (ECF No. 3.)

Subsequently, the parties reached an agreement to dissolve the TRO and allow Paselo to resume

operating the Huber Breaker project during the pendency of this lawsuit, subject to certain conditions. On September 30, 2014, pursuant to the agreement and request of counsel, we vacated the TRO and denied as moot Plaintiff's Motion for Preliminary Injunction. (ECF No. 11.)

Thereafter, Defendants filed a Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (ECF No. 18.) The Motion to Dismiss was denied on February 18, 2015. (ECF No. 31.) On March 9, 2015, Defendants filed their Answer, asserting a counterclaim against Reivia for breach of contract. (ECF No. 35.)

Ultimately, after protracted and contentious party and third-party discovery, a bench trial was held on June 19-20, 2017. (ECF Nos. 109, 110.) At the conclusion of the trial, the parties were directed to file proposed findings of fact and conclusions of law. (Order, ECF No. 111; 6/20/17 Tr. 150-151, ECF No. 114.) On October 10, 2017, at the parties' request, we heard oral arguments regarding the case and the evidence presented at trial. (ECF No. 123.) Based upon the evidence and testimony presented at trial, and after consideration of the parties' post-trial submissions and argument, we conclude that Plaintiff is entitled to judgment against Defendants Paselo, P. Scalleat and Franco on Plaintiff's claim for breach of contract (Count I). We find in favor of Defendants on Plaintiff's claims for conversion (Count II) and an accounting (Count III), and we find in favor of Plaintiff on Defendants' Counterclaim for breach of contract. In accordance with Federal Rule of Civil Procedure 52, we make the following findings of fact and conclusions of law.

## II.    FINDINGS OF FACT

### A.    Background

1.    Plaintiff Reivia is a Delaware limited liability company. (Compl. ¶ 1.)

2.    Ronald Jay Garner ("Garner") is Reivia's sole owner and president. (*Id.* ¶ 6.)

3.	Prior to his involvement in the Huber Breaker project, Garner had worked primarily in the investment banking and commercial real estate finance industries.  He did not have any background in the scrap metal business.  (6/19/17 Tr. 14-16, ECF No. 113.)

4.	Defendant Paselo is a Pennsylvania limited liability company formed in 2012 by Defendants P. Scalleat and Franco.  (6/20/17 Tr. 4-5, 124.)  P. Scalleat and Franco are the sole owners of Paselo.[1]  (*Id.* at 4.)

5.	Paselo is in the scrap metal demolition, brokerage, and resale business, and P. Scalleat has worked in the demolition and scrap metal sale and brokerage business for approximately 20 years.  (6/20/17 at 5, 10-11, 55, 67, 124.)

6.	Franco has worked for approximately 30 years in the trash and recycling business.  (*Id.* at 124-125.)

7.	Prior to the events that led to this dispute, Garner was acquainted with Franco, who he had previously met through Franco's brother on a few occasions.  (6/19/17 Tr. 16-17; 6/20/17 Tr. 126-127.)

8.	Defendant M. Scalleat is P. Scalleat's sister.  She worked for Paselo at Huber Breaker from approximately the Fall of 2013 until September or October 2014.  (6/19/17 Tr. 161, 167.)

9.	M. Scalleat worked in the Huber Breaker office, handling bookkeeping and administrative tasks such as payroll and record keeping.  (*Id.* at 163.)

---

[1]  Pennsylvania Department of State records reflect that Paselo's Certificate of Organization was filed on June 12, 2012. *See* https://www.corporations.pa.gov/search/corpsearch.   At any stage of a case, a court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201; *O'Neal v. Rogers*, No. 14-3722, 2015 WL 5063955, at *2 (E.D. Pa. Aug. 27, 2015) (citations omitted).

**B.     The Huber Breaker Project**

10.     In late 2012 or early 2013, Franco and Garner happened to meet again, and Franco informed Garner of a potential business opportunity at the Huber Breaker site.  (6/19/17 Tr. 17-18.)

11.     Franco asked Garner if he would consider lending approximately $1 million to Franco and P. Scalleat to acquire the Huber Breaker property in its owner's bankruptcy proceeding.  (*Id.*)  Franco described the economics of the proposed transaction as very significant and opined that the Huber Breaker project could generate close to $8-10 million.  (*Id.* at 18.)

12.     After the initial discussion of the project, P. Scalleat led Garner, Franco, and M. Scalleat on a tour of the Huber Breaker site, which contained several structures, a number of pieces of industrial equipment, and numerous loose pieces of metal.  (*Id.* at 20-25.)

13.     During the tour, P. Scalleat estimated the potential quantity and sale value of various items of equipment, steel and scrap metal on the site, and he outlined four anticipated phases for the project.  (*Id.* at 25-28.)

14.     According to P. Scalleat, Phase 1 would take about three to four months and would consist of the removal of the equipment and the steel that was on the ground.  P. Scalleat estimated that Phase 1 would generate approximately $1.5 million in revenue, less $250,000 to $300,000 in expenses.  (*Id.* at 27.)

15.     Phase 2 would involve demolition of the structures to obtain additional scrap metal for sale.  (*Id.*)

16.     In Phase 3, P. Scalleat advised that with the site cleared of structures and scrap metal, Paselo would be able to mine and sell coal or what Scalleat described as "sill" that he believed was near the surface of the site and, thus, accessible.  (*Id.* at 27-28.)

17.     The final phase of the project would be the sale of the real estate, which P.

Scalleat estimated was worth $500,000 to $700,000 once everything was demolished.  (*Id.* at 28.)

18.     P. Scalleat told Garner that with his experience in the scrap and demolition

business, he was comfortable handling the equipment and permitting requirements necessary for

the demolition, that he was familiar with a company that could handle the environmental issues,

and that he and Franco owned certain pieces of equipment that they would contribute to the

project.  (*Id.*)

19.     P. Scalleat also provided Garner with a 2008 report prepared on behalf of Huber

Breaker's prior owner (the "Bianchi Report") estimating that demolition of the site's structures

would yield 7,750 tons of steel.  (*Id.* at 29; Ex. P-6 at 4-6 (unnumbered).) [2]

20.     Subsequently, P. Scalleat and Franco gave Garner a written Project Summary

prepared by P. Scalleat, which projected revenue from the project of $11.7 to $12.2 million, less

an estimated $1 million in costs for demolition and environmental cleanup.  (6/19/17 Tr. 30- 32,

97-98; Ex. P-6 at 1.)

21.     Specifically, the revenue components of the Project Summary projected:

(1) $300,000 as the value of the site, not including mineral or salvage rights; (2) $7.5 million for

the site's mineral rights; and, (3) on-site salvage yield of 13,200 tons with an anticipated value of

$3,960,000 (at $300 per ton) to $4,488,000 (at $340 per ton).  (Ex. P-6 at 1.)

22.     Independently of P. Scalleat and Franco, Garner researched steel trading values

via internet searches and phone inquiries.  He also discussed the site with an appraiser, but did

not obtain an independent appraisal report.  (6/19/17 Tr. 29, 93-95, 101.)

---

[2] Citations to "Ex. P-__" and "Ex. D-__" refer, respectively, to Plaintiff's and
Defendants' exhibits admitted at trial, which are on file with the Court.

### C.    Reivia's Loan to Paselo

23.    Based on the site visit, the Project Summary, the Bianchi Report, and his own research, Garner agreed to lend P. Scalleat and Franco approximately 90 percent of the purchase price for the Huber Breaker site through a loan from Reivia to Paselo, with the remaining 10 percent to be provided by Paselo.  (*Id.* at 31-32, 52.)

24.    Reivia and Paselo entered into a Loan Agreement dated May 1, 2013, under which Reivia agreed to lend Paselo $1,147,500, at a fixed interest rate of 3 percent per year (to accrue as stated in the Warrant),[3] for the purpose of purchasing the Huber Breaker property. (6/19/17 Tr. 32; Ex. P-1 §§ 2.1.1 and 2.1.4.)

25.    The Loan Agreement also permitted Paselo to receive, subject to Reivia's discretionary approval, advances of the Loan for up to $100,000 to fund the costs incurred in connection with due diligence as to the property.  (Ex. P-1 § 2.1.7.)

26.    The Loan Agreement provided that "[i]n consideration for Lender agreeing to make the Loan to a start-up business at a comparatively low interest rate," Paselo would pay Reivia, on a monthly basis:  (i) 50 percent of Excess Cash Flow (defined as gross revenues from the sale of scrap metals, less expenses approved by Reivia), and (ii) 33 1/3 percent of Net Proceeds from the sale of coal, once Excess Cash Flow exceeded $3 million.  (*Id.* § 2.1.9.)

27.    Reivia also had the right to approve the payment of expenses and transfers from Paselo's depository account to its operating account.  (*Id.* § 6.17.)

28.    The Loan Agreement defined the "Collateral" as "all collateral received or delivered as security for the Obligations pursuant to, and as more particularly described in, this

---

[3]  The Agreement defines the referenced "Warrant" as "that certain Warrant issued by Borrower in favor of Lender concurrently with the Closing."  (Ex. P-1 at 4, Definitions.)  The parties did not attach a Warrant to any of the pleadings or motions in this case, nor was one referenced in testimony or introduced as an exhibit at trial.

Agreement, on the other Loan Documents, including without limitation, all property being conveyed to Borrower in connection with that certain Asset Purchase Agreement dated as of _____, 2013 between Borrower and Michael Oleyar, Chapter 7 Trustee." (*Id.* § 1 (blank line in original).)

29.     The term "Obligations" was defined as "all amounts due to Lender under this Agreement, the Note and any other Loan Document." (*Id.* at 3, Definitions.)

30.     With respect to "Security for the Obligations," the Loan Agreement provided:

> The Obligations shall be secured by a first priority mortgage and security interest in all properties and assets of Borrower, including the Real Property,[4] furniture, fixtures, equipment, goods, contract rights, accounts, documents, instruments and chattel paper, business and financial records, intellectual property and general intangible assets of Borrower.

(Ex. P-1 § 3.)

31.     Reivia's obligation to make the loan was conditioned upon Paselo's payment of "no less than $127,500 of its own funds toward the purchase price" of the Huber Breaker property. (*Id.* § 5.2.9.)

32.     Among its other obligations under the Loan Agreement, Paselo was required to:

> (i) pay and maintain adequate reserves for the payment of all taxes and other obligations which, if unpaid, might become an encumbrance against Paselo or its assets;
>
> (ii) file all Federal, state and local tax returns and other reports required by law to be filed;
>
> (iii) permit Reivia or its designees to visit and inspect Paselo's properties and assets, examine its books and records, and discuss the affairs, finances and accounts of Paselo with its officers, employees and accountants;

---

[4]  The Loan Agreement defined the "Real Property" as "that certain parcel of real property located in Ashley, Pennsylvania, as more specifically identified in the Mortgage." (Ex. P-1 at 3, Definitions.)

(iv) keep adequate books and records of account, in accordance with GAAP, reflecting all of its business and financial transactions, and maintain copies of such books and records on site;

(v) promptly pay any indebtedness due to third parties; and,

(vi) comply with all environmental laws.

(*Id.* §§ 6.5, 6.6, 6.9, 6.12, and 6.15.)

33. The payment terms of the Loan Agreement provided, in relevant part, as follows:

Section 2.1.3. <u>Payment of Principal</u>. Unless otherwise accelerated pursuant to the terms hereof, the unpaid principal amount of the Loan, together with all other amounts due and owing under the Note, shall be due and payable in full on the Stated Maturity Date unless lender exercises the Warrant prior to such date. Lender shall have the unfettered right, but not the obligation, to exercise the Warrant at any time . . . .

Section 2.1.6. <u>Maturity</u>. Except where this Agreement or any instrument evidencing indebtedness hereunder provides that the obligations of Borrower shall become due upon any earlier date and notwithstanding any applicable provisions permitting repayment at a later date, the Loan shall become fully and finally due and payable on the earlier of (a) the Stated Maturity Date, and (b) the date of acceleration pursuant to Section 11.1

(*Id.* §§ 2.1.3 and 2.1.6.)

34. Circumstances that would constitute an "Event of Default" included if:

(a) Borrower shall fail to pay (i) the principal amount of the Loan when due, (ii) any accrued and unpaid interest on the Loan when due, or (iii) any fees or expenses payable under this Agreement, the Note or the other Loan Documents; or

(b) Borrower shall fail to perform any other term covenant or agreement contained in this Agreement; or

\* \* \*

(k)  Lender, at any time and in good faith, shall deem itself insecure (and for purposes of this Agreement, Lender shall be entitled to deem itself insecure when some event occurs, fails to occur or is threatened in writing or some objective condition exists or is threatened in writing which materially impairs the prospects that any of the Obligations will be paid when due, which significantly impairs the value of the Collateral to Lender or which materially affects the financial condition or business operations of Borrower).

(*Id.* § 10.1(a), (b), and (k).)

35.     The Agreement provided that upon the occurrence of an Event of Default:

(a)  the unpaid principal amount of the Loans, together with accrued interest thereon, and all other Obligations shall become immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived; [and]

(b) Lender may exercise any and all other rights and remedies it has under this Agreement, the Note or the other Loan Documents or at law or in equity, and proceed to protect and enforce Lender's rights by any action at law, in equity or other appropriate proceeding.

(*Id.* § 11.1.)

36.     Section 2.2.2 of the Loan Agreement provided for the indemnification of Reivia by Paselo and its Principals (defined as Franco and P. Scalleat) as follows:

Borrower and the Principals shall, jointly and severally indemnify and hold harmless Lender and the Lender Affiliates, and each such person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, included those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement, the Note or the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and

thereunder and any actions or failure to act in connection therewith, including any and all environmental liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to this Agreement, the Note or any of the other Loan Documents (collectively, "Indemnified Liabilities"); provided, that Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's gross negligence or willful misconduct.

(*Id.* § 2.2.2.)

37.     The Loan Agreement further provided that "Borrower will pay on demand all expenses incurred by Lender in connection with . . . (iii) Lender's exercise, preservation or enforcement of any of its rights and remedies [under this Agreement], including, without limitation, reasonable fees and expenses of outside legal counsel or the allocated costs of in house legal counsel, accounting, appraisal, auditing, consulting, brokerage or other similar professional fees or expenses . . . ." (*Id.* § 12.3.)

38.     Finally, the Loan Agreement included the following provision relevant to this dispute.

> Section 12.9.  <u>No Agency Relationship</u>.  Lender is not the agent, fiduciary, partner or representative of, or member in, Borrower nor is Borrower the agent, fiduciary, partner or representative or, or member in, Lender and this Agreement shall not make Lender liable to any third party, including but not limited to, Borrower's shareholders, directors, officers, creditors or any other person.

(*Id.* § 12.9.)

39.     Franco executed the Loan Agreement on behalf of Paselo, and Franco and P. Scalleat each executed the Loan Agreement as Principals.  (*Id.* at 22.)

40.     Pursuant to the Loan Agreement, Paselo entered into a Note, dated May 8, 2013, in favor of Reivia.  (*Id.* § 2.1.2; Ex. P-2.)  The Note did not identify the principal amount of the

loan, but it did provide for interest on the unpaid principal at an annual rate of 3 percent. (Ex. P-2 § 2.)

41. Under the Note, the Maturity Date of the Loan was April 30, 2015. (*Id.* § 3.)

42. Franco executed the Note on behalf of Paselo. (Ex. P-2.)

43. Also pursuant to the Loan Agreement, Paselo granted Reivia a Mortgage on the Huber Breaker property, including the land, all buildings and fixtures, and all condemnation awards, insurance proceeds and other rights possessed by the property owner. [5] (Ex. P-3.)

44. The Mortgage identified the loan amount as $1,147,500. (*Id.* § 1.)

45. Franco executed the Mortgage on behalf of Paselo on May 8, 2013. (Ex. P-3.)

**D. Acquisition and Operation of Huber Breaker**

46. On October 11, 2013, Paselo purchased the Huber Breaker property from its former owner's bankruptcy estate for $1,275,000. (6/19/17 Tr. 36; *see also In re No. 1 Contracting Corp.*, No. 10-01755 at ECF No. 311 (Bankr. M.D. Pa.).)

47. Although the Loan Agreement and Mortgage specified a loan by Reivia of $1,147,500, the record reflects that Reivia actually loaned Paselo $1,208,677 to fund the acquisition of the Huber Breaker property. (Compl. ¶¶ 20, 22; Garner Decl., Compl., Ex. 1, ECF No. 1-1; 6/19/17 Tr. 32; 6/20/17 Tr. 25.)

48. Pursuant to the Agreement's requirement that Paselo contribute at least 10 percent of its own funds toward the Huber Breaker purchase price, P. Scalleat and Franco collectively contributed $127,500 in personal funds toward the purchase price. (6/20/17 Tr. 27, 131.)

49. Because P. Scalleat and Franco "were a little cash strapped at the time," they borrowed at least part of that sum from someone named Dennis. (*Id.* at 27-29.)

---

[5] The Loan Agreement, Note, and Mortgage are referred to herein, collectively, as the "Agreement."

50.     P. Scalleat testified that he did not know or could not recall the full name of the lender, "Dennis"; the amount or terms of the loan; whether the loan was made to Paselo or to him and Franco, personally; or whether the loan was documented.  (*Id.* at 28-29.)

51.     Subsequently, Garner agreed to use revenue from the project to return approximately $80,000 of Paselo's contribution to its principals, P. Scalleat and Franco, who told Garner they were experiencing "financial personal pressure."  (6/19/17 Tr. 53; 6/20/17 Tr. 29.)

52.     In order to implement their Agreement, the parties set up a process to handle and account for the revenue generated and expenses incurred by the Huber Breaker project.

53.     Under this process, all revenues from the sale of scrap metal, equipment, and other materials from the project were to be deposited in a Paselo Wells Fargo Bank business checking account designated as "Paselo 2," whose sole signatories were Garner and P. Scalleat.  (6/19/17 Tr. 33-34; 6/20/17 Tr. 61; Ex. P-9.)

54.     The parties agreed to open this account and designate it "Paselo 2" because Paselo had a pre-existing Wells Fargo business checking account (designated "Paselo 1") that P. Scalleat and Franco used to operate all of their scrap metal business.  (6/19/17 Tr. 33; 6/20/17 Tr. 61-62, 67; Ex. P-10.)

55.     P. Scalleat, Franco, and M. Scalleat were the signatories on the Paselo 1 account.  (6/19/17 Tr. 34, 186.)  Garner had no access to the Paselo 1 account unless P. Scalleat or Franco authorized it.  (*Id.* at 176-177; 6/20/17 Tr. 85.)

56.     Effectively, Paselo 2 was the depository account for Huber Breaker revenue, and Paselo 1 was the operating account Paselo used for both the Huber Breaker project and its separate, pre-existing scrap metal business.  (6/19/17 Tr. 33-34; 6/20/17 Tr. 134-135.)

57.    Once project operations commenced, Garner would come to the site on a weekly basis and meet with M. Scalleat and/or P. Scalleat to collect project revenue and review the lists of expenses M. Scalleat prepared.  (6/19/17 Tr. 37-39.)

58.    After collecting the revenue, Garner would deposit it in Paselo 2, then immediately transfer those funds from Paselo 2 to Revia's business checking account at Wells Fargo (the "Reivia Account").  (*Id.* at 37; Ex. P-10.)

59.    Garner would then typically transfer funds or write checks from the Reivia Account to Paselo so that Paselo could us those funds to pay project expenses (including payroll) that Garner had reviewed and approved.  (6/19/17 Tr. 37-38, 42-43.)

60.    Early in the project, P. Scalleat and M. Scalleat asked Garner to pay certain project expenses directly because Paselo was disorganized, and Franco, who was responsible for making equipment payments, had lost some of those invoices.  (*Id.* at 38.)

61.    To ensure timely payment of unexpected and urgent expenses that might arise when he was not available, Garner left at Huber Breaker a blank, signed check from the Reivia Account, which Paselo was authorized to fill out and use after obtaining Garner's approval.  (*Id.* at 65-66, 175; 6/20/17 Tr. 80.)

62.    Paselo began selling equipment and metal obtained from the Huber Breaker site in late October 2013.  (6/19/17 Tr. 36, 75.)

63.    Material from the Huber Breaker site was sold to a number of businesses, including Eastern Metal Recycling Inc. ("EMR"), Weitsman & Sons ("Weitsman"), Staiman Recycling Corporation ("Staiman"), DMS Shredding ("DMS"), SIMS, Allan Industries, and Tabit & Sons ("Tabit").  (6/19/17 Tr. 51; Ex. P-30-B.)

64.    EMR, Weitsman, and Tabit were existing customers of Paselo's scrap metal business before Paselo purchased Huber Breaker.  (6/19/17 Tr. 52; 6/20/17 Tr. 31.)

65.     Paselo employees performed the salvage and demolition at Huber Breaker, using equipment owned or leased by Franco's company, Green Earth North.  (6/19/17 Tr. 48-51; 6/20/17 Tr. 72-73, 114-15, 131.)

66.     Paselo paid most of the project employees in cash, and there is no evidence that Paselo provided 1099 tax forms or documentation of tax withholding to any personnel, other than M. Scalleat, who worked on the site.[6]  (6/19/17 Tr. 156-157, 172).

67.     At the time of trial, Paselo had not yet filed tax returns for 2013 or 2014 (6/20/17 Tr. 19).

68.     In general, Paselo's record keeping with respect to both the Huber Breaker project and its separate business was rudimentary and incomplete, and P. Scalleat repeatedly testified at trial that he was unsure whether certain records existed and, if so, where they were maintained. (*Id.* at 8-9, 12-17, 53-54.)

69.     Throughout the project, Garner contemporaneously maintained spreadsheets of the Huber Breaker revenue and expenses reported to him, and the payments from the Reivia Account for project expenses.  (6/19/17 Tr. 40-47; Exs. P-30-A, P-30-B, P-30-C.)

70.     According to Garner, the only Huber Breaker revenue not recorded in his spreadsheets was a cash payment of $14,800 that Paselo received for some equipment sold in the first week of the project.  (6/19/17 Tr. 44-45.)

71.     The parties agreed to split that payment, because P. Scalleat and Franco "needed some personal cash," with Garner receiving $7,400 and P. Scalleat and Franco, collectively, receiving $7,400.  (*Id.* at 45.)

---

[6]  M. Scalleat testified that she received a 1099 from Paselo but that she did not know of any other employees who received 1099s.  (6/19/17 Tr. 173.)

72.     During the approximately ten months of project operation, the project produced approximately $1.7 million in revenue, and Garner provided Paselo, or directly paid, just over $1 million from the Reivia Account for the payment of expenses.  (Ex. P-30-A; Ex. P-30-C; 6/20/17 Tr. 147.)

### E.     Paselo's Separate Scrap Metal Business

73.     During the operation of the Huber Breaker project, Paselo continued to conduct its pre-existing scrap metal brokerage and resale business, which sold to some of the same customers — including EMR, Weitsman, and Staiman — that also bought scrap metal from the Huber Breaker site.  (6/19/17 Tr. 51-52; 6/20/17 Tr. 30, 38, 136-37.)

74.     The record includes Paselo's documentation of nonferrous scrap metal purchases that it made during 2012 and 2013, before it purchased Huber Breaker.  (Ex. D-52 - D-65.)

75.     Paselo did not immediately sell all of the scrap metal it obtained for its separate business; rather, Paselo stored some of it and sold it later when the market price became more attractive.  (6/20/17 Tr. 50.)

76.     EMR's records reflect that during the period from January through September, 2013 — before the Huber Breaker project began — Paselo made more than 500 sales to EMR, an average of more than 50 sales per month.  (Ex. P-19; 6/20/17 Tr. 45-50.)

77.      Paselo had more than $230,000 in sales to EMR in January 2013, and almost $170,000 in May 2013, when the price had dropped from about $280 per gross ton (in January 2013) to $225 per gross ton.  (Ex. P-19.)

78.     According to P. Scalleat, approximately one to three of the daily loads delivered to EMR during the time of the Huber Breaker project were from Paselo's separate brokerage business, not from the Huber Breaker site.  (6/20/17 Tr. 68-70.)

79.     In its brokerage business, Paselo would sell scrap on a broker's behalf and then pay the broker a set price per ton, with Paselo retaining a small profit ranging from about five to eight percent of the sale price.  (*Id.*; Ex. P-19.)

80.     P. Scalleat estimated that during the Huber Breaker project, Paselo's brokerage business sold approximately $900,000 to $950,000 worth of scrap, from which P. Scalleat and Franco split approximately $80,000 in profit.  (6/20/17 Tr. 69-70, 139.)

81.     Boylan Dumpster Rental is a trash and recycling company that transported loads of scrap metal to and from the Huber Breaker project and Paselo's separate business.  (*Id.* at 91-92; Ex. P-23.)

82.     Kevin Boylan ("Boylan") testified that he picked up roll-off containers for Paselo at the Huber Breaker site, drove them to Philadelphia, and delivered the contents, as instructed, at one of several customers, including EMR, Weitsman, or Staiman.  (6/20/17 Tr. 92-93.)  Then, per instructions from Paselo, Boylan frequently picked up another container, filled with metal, from Philadelphia, and drove it to the Huber Breaker site.  (*Id.* at 92-93, 105-06.)

83.     Boylan transported containers full of metal from Philadelphia to the Huber Breaker site approximately four to six times per week.  (*Id.* at 94.)

**F.      The Parties' Dispute**

84.     In the second quarter of 2014, Garner became concerned that equipment and loose steel had been removed from the Huber Breaker site, the revenue being generated by the project was below the levels anticipated, and the remaining material on the site appeared insufficient to generate enough revenue to repay Reivia's loan.  (6/19/17 Tr. 53; 6/20/17 Tr. 74.)

85.     Garner's concern increased as buildings were demolished and steel from the structures was removed.  In his view, the cash flow from the project "didn't seem to match the revenue anywhere near what we had discussed at the acquisition."  (6/19/17 Tr. 54.)

86.     Garner voiced his concerns primarily to P. Scalleat, who reassured him that the project was on target.  (*Id.*)

87.     Also in the second quarter of  2014, Franco gave Garner a compilation of unpaid invoices, some dated as early as December 2013.  (*Id.* at 57-58.)

88.     A number of the unpaid invoices were from Midlantic Machinery Company for repairs to equipment owned or financed by Franco's company, Green Earth North.  (*Id.* at 57-58, 110-16; 6/20/17 Tr. 40-42, 109-11, 144-45.)

89.     Franco was unable to explain to Garner why the bills had not previously been submitted for payment.  (1/19/17 at 57-58, 110-11.)

90.     Garner asked P. Scalleat to review the invoices and confirm whether they were related to equipment damage that occurred at the Huber Breaker project or at some other Paselo job.  (*Id.* at 112-15.)  P. Scalleat never provided such confirmation.  (*Id.*)

91.     At the time of trial, Green Earth North owed Midlantic Machinery Company more than $375,000 in unpaid invoices, at least some of which related to equipment used by Paselo at the Huber Breaker site.[7]  (6/19/17 Tr. 183; 6/20/17 Tr. 113-14.)

92.     At some point during the second quarter of 2014, because of his concerns about the project, Garner asked to see Paselo's business records, including the Paselo 1 account records.  (6/19/17 Tr. 54-55; 6/20/17 Tr. 74.)

93.     Paselo did not provide the Paselo 1 account records to Garner for at least three months.  (6/20/17 Tr. 74-75, 85.)

---

[7]  In April 2016, Midlantic Machinery filed a lawsuit against Green Earth North related to the unpaid invoices.  That lawsuit is pending.  (6/20/17 Tr. 117-118); *see also F&M Equip. Ltd. and Midlantic Mach. v. Green Earth Recycling LLC, et al.,* Case No. 2016-06796 (Montg. Ct. Com. Pl.).

94.     On or about July 3, 2014, while his request for Paselo's records was outstanding, Garner told P. Scalleat that he was going to take $600,000 from the Reivia Account to partially repay Reivia's loan, leaving approximately $100,000 in the account to pay project expenses. (6/19/17 Tr. 58-59; 6/20/17 Tr. 71.)

95.     P. Scalleat had no objection to Garner partially repaying the loan in this fashion. (6/20/17 Tr. 71.)

96.     Other than the $600,000 partial repayment in July 2014 and the $7,400 Garner received from the cash equipment sale early in the project, Paselo has not repaid Reivia any of the principal or interest due on the loan.[8] (*Id.* at 88.)

97.     Garner repeated his request for Paselo's records during the summer of 2014, and ultimately threatened legal action if they were not provided to him. (6/19/17 Tr. 55-56; 6/20/17 Tr. 74-75.)

98.     In late August 2014, at P. Scalleat's or Franco's direction, M. Scalleat gave Garner the information necessary to access the Paselo 1 account records online. (6/19/17 Tr. 60-61, 176-77; 6/20/17 Tr. 74-75, 84-85.)

99.     Garner reviewed the account and compared the check deposits in Paselo 1 against his spreadsheet of the revenue deposits that he had made to the Paselo 2 account. (6/19/17 Tr. 62-63; Ex. P-8; Ex. P-49.) Garner identified several checks from Staiman, Weitsman and EMR that had not been given to him but had been deposited in the Paselo 1 account. (*Id.*)

---

[8]     At trial, Franco testified that he believed Garner took another partial repayment of more than $100,000. (6/20/17 Tr. 87-88.) This testimony was not corroborated by any other evidence and was not credible.

100. Based on this discovery, Garner suspected that Paselo had removed and sold material from the Huber Breaker site and attempted to conceal it from him by depositing the sale proceeds in the Paselo 1 account. (6/19/17 Tr. 61.)

101. On or about August 25, 2014, Garner directed Wells Fargo to place a stop payment on the Reivia Account blank check he had left with Paselo. (6/19/17 Tr. 67; Ex. P-29.) Garner issued the stop payment order because he was no longer "comfortable with [Paselo] holding a signed check." (6/19/17 Tr. 67.)

102. On or about August 26, 2014, Garner met privately with P. Scalleat near the Huber Breaker site and confronted him about the Paselo 1 check deposits. (*Id.* at 64; 6/20/17 Tr. 76, 84.)

103. P. Scalleat told Garner he did not know what the deposits related to and asked Garner to give him a day or two to discuss them with Franco.[9] (6/19/17 Tr. 64; 6/20/17 Tr. 84.)

104. On or about August 29, 2014, Franco obtained from M. Scalleat the blank Reivia Account check Garner had left at Huber Breaker. (6/19/17 Tr. 175; 6/20/17 Tr. 176.) Before giving Franco the check, M. Scalleat attempted to contact Garner by telephone, but did not reach him. (6/19/17 Tr. 175-176.)

105. The same day, without Garner's approval, Franco filled out the check, making it payable to Paselo in the amount of $100,000, and attempted to cash it at a Wells Fargo branch. (6/19/17 Tr. 68; 6/20/17 Tr. 141; Ex. P-28.)

---

[9] At trial, Garner testified that P. Scalleat affirmatively told him that Paselo's only business at that time was the Huber Breaker project. (6/19/17 Tr. 64.) P. Scalleat testified that he did not tell Garner what business the check deposits might or might not be from because he simply could not identify them and did not know where they were from at that point. (6/20/17 Tr. 84.)

106.     Wells Fargo contacted Garner, who was on vacation, and Garner told the bank not to honor the check and to notify the authorities.  (6/19/17 Tr. 68.)

107.     The following week, Reivia filed its Complaint and Motion for TRO and Preliminary Injunction.

108.     After the parties reached their agreement to lift the TRO, Paselo continued to operate the Huber Breaker site for a short period of time, after which the site was closed down. (6/19/17 Tr. 72; 6/20/17 Tr. 83.)

109.     By the time the project shut down, if not earlier, the Huber Breaker site was not in compliance with environmental requirements, and the site was not compliant at the time of trial. (6/20/17 Tr. 83.)

110.     In connection with the litigation, Reivia obtained records from EMR, Staiman, Weitsman, and Tabit identifying their purchases from Paselo during the time of the Huber Breaker project.  (6/19/17 Tr. 72-84; Exs. P-12, P-14, P-16-P-22, P-53.)

111.     Garner compared the customer purchase records to his records of the Huber Breaker project revenue and identified a total of $953,904.94 in customer payments to Paselo that had not been given to him for deposit in Paselo 2.  (6/19/17 Tr. 83, 129; Ex. P-51.)

112.      None of those customer purchase records identified the source from which Paselo obtained the scrap metal it sold to EMR, Staiman, Weitsman, or Tabit.  (Ex. P-12, P-14, P-16-P-22, P-53.)  The records do not reveal whether the material originated from the Huber Breaker site or from Paselo's separate scrap metal business.

113.     During the discovery stage of this case, Reivia took the deposition of P. Scalleat, who testified that he had kept records — described as notebooks, receipt books, journals or ledgers — of Paselo transactions that did not involve Huber Breaker, and that those records

were, at the time, "with Kevin," at the home of P. Scalleat's mother, or at Paselo's "scale house." (6/20/17 Tr. 15-19.)

114.    Subsequently, on February 6, 2015, Reivia served document requests and interrogatories requesting that Paselo provide information and documents relating to Paselo's non-Huber Breaker business for the years 2013 through 2015.   (ECF Nos. 46-2, 46-3.)

115.    On May 7, 2015, after an exchange of correspondence between counsel about the outstanding discovery requests and other discovery issues, Reivia filed a Motion to Compel Paselo's responses to the written discovery.  (ECF No. 46.)

116.    Ultimately, on or about May 26, 2015, Paselo served responses to the outstanding discovery, objecting to the requests regarding Paselo's non-Huber Breaker business, and producing 12 pages of documents related to transactions that pre-dated the Huber Breaker project.  (6/20/19 Tr. 14-15, 149-150; ECF Nos. 46, 124.)

117.    From May 26, 2015 through the trial of this case two years later, Reivia did not file any further motions to compel or request any other relief from the Court in order to obtain the documents and information from Defendants related to the non-Huber Breaker business that Paselo was conducting during the Huber-Breaker project.

## III.    CONCLUSIONS OF LAW

### A.    Breach of Contract

Under Pennsylvania law, a breach of contract is established where a party proves:  (i) the existence of a contract, including its essential terms; (ii) the breach of a duty imposed by the contract; and (iii) resultant damages.  *Angino v. Wells Fargo Bank, N.A.*, 666 F. App'x. 204, 207 (3d Cir. 2016) (citing *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003); *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

### 1. *Paselo Breached And Defaulted On Its Contract With Reivia*

It is undisputed that Paselo and Reivia entered into the Agreement, and that P. Scalleat and Franco individually executed the Loan Agreement as the Principals of Paselo. (6/19/17 Tr. 32; 6/20/17 Tr. 25, 129-30; Ex. P-1.) The record also establishes that, pursuant to the parties' Agreement, Reivia loaned Paselo almost all of the money necessary for Paselo's purchase of the Huber Breaker property. (Ex. P-1 § 2.1.1; 6/19/17 Tr. 32; 6/20/17 Tr. 25.)

Although the documents comprising the parties' Agreement are lacking in some respects, the precise amount of Reivia's loan can be ascertained from the credible and uncontroverted evidence of record. In its Complaint, Reivia specifically alleged that it ultimately loaned Paselo $1,208,677. (Compl. ¶ 20.) None of the evidence at trial refuted this allegation. Although the Loan Agreement and Mortgage identify the loan amount as $1,147,500, the Note does not specify the amount of the loan. (Ex. P-1, P-2, P-3.) Moreover, all three of these documents were executed before Paselo entered into its Asset Purchase Agreement for the Huber Breaker Property, and months before the sale closed, when the parties did not yet know the precise amount for due diligence and closing costs. *See In re No. 1 Contracting Corp.*, No. 10-01755 at ECF No. 251-5 (Bankr. M.D. Pa.). In addition, the Loan Agreement expressly contemplated that Paselo could receive advances of the loan of up to $100,000 to fund due diligence costs related to the acquisition. (Ex. P-1 § 2.1.7.) Finally, both Garner and P. Scalleat testified consistently that Reivia loaned Paselo "approximately $1.2 million." (6/19/17 Tr. 32; 6/20/17 Tr. 25.)

From this record, we find that the principal amount of the loan at issue is $1,208,677. In so finding, we recognize the $61,177 discrepancy between this amount and the $1,147,500 specified in the Loan Agreement and Mortgage. However, we are satisfied that the parties agreed to orally modify the original Loan Agreement or entered into an implied contract for the

loan of the additional $61,177 on the same terms. *See First Nat'l Bank of Pa. v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 280 (3d Cir. 1987) (noting that Pennsylvania law permits oral modification of a written contract, if shown by clear, precise and convincing evidence, despite a clause prohibiting oral modification, and oral modification may be accomplished by either words or conduct); *Equip. Fin., LLC v. Hutchison*, No. 09-01964, 2011 WL 4482345, at *14 (E.D. Pa. Sept. 27, 2011) ("A contract implied in fact can be found by looking to the surrounding facts of the parties' dealings.") (citing *Ingrassia Constr. Co. v. Walsh,* 486 A.2d 478, 483 (Pa. Super. Ct. 1984)).

Having resolved the amount of the loan, we find that Paselo defaulted under the Agreement in more than one respect. Pursuant to the Agreement, Paselo was obligated to repay the principal balance of the loan, with three percent annual interest, at the earlier of: (a) the Maturity Date of April 30, 2015, or (b) the date of acceleration once an Event of Default occurred. (Ex. P-1 §§ 2.1.3, 2.1.6; Ex. P-2.) To date, Paselo has repaid only $607,400 of the principal and none of the interest.

In addition, the record reflects that Paselo also failed to: (a) maintain on site copies of its books and records, and make such books and records available to Reivia on reasonable notice; (b) timely pay its indebtedness to third parties; (c) file all of its tax returns; and, (d) comply with all environmental laws. Paselo's failure to perform these obligations constituted Events of Default under the Sections 10.1(a) and (b) of the Loan Agreement.

In addition, an Event of Default occurred when Reivia:

> [I]n good faith, [deemed] itself insecure (and for purposes of this Agreement, [Reivia] shall be entitled to deem itself insecure when some event occurs, fails to occur or is threatened in writing or by some objective condition exists or is threatened in writing which materially impairs the prospects that any of the Obligations will be paid when due, which significantly impairs the value of the

> Collateral to Lender or which materially affects the financial
> condition or business operations of [Paselo]).

(Ex. P-1 § 10.1(k).)  Therefore, pursuant to the Agreement and based on the evidence, we find

that an Event of Default occurred, at the latest, when Garner discovered what he in good faith

believed were suspicious deposits to the Paselo 1 account and, shortly thereafter, Franco

attempted to negotiate the unauthorized $100,000 check from the Reivia account.

As a result of Paselo's breach of the parties' Agreement, Reivia is entitled to recover as

damages the $601,277 unpaid principal balance of the loan, plus interest of 3 percent per annum

as provided for in the Agreement.  Interest shall continue to accrue on the unpaid principal

balance until such balance is paid in full.

As is discussed in more detail below, Reivia failed to offer evidence of any damages,

beyond the unpaid loan and interest, resulting from Defendants' breaches of the Agreement.

### 2.    *Franco and P. Scalleat Are Individually Liable to Reivia*

As a general rule, members of a Pennsylvania limited liability company are not

personally liable for the debts, obligations or other liability of the LLC.  *See Commonwealth,*

*Dep't of Envtl. Prot. v. Trainer Custom Chem. LLC*, 204 F. Supp. 3d 814, 826 (E.D. Pa. 2016)

(citing *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1520-21 (3d Cir. 1994)); *see also*

15 Pa. Cons. Stat. Ann. § 8834(a) ("A member or manager is not personally liable, directly or

indirectly, by way of contribution or otherwise, for a debt, obligation or other liability of the

company solely by reason of being or acting as a member or manager.").  Pennsylvania law

recognizes a strong presumption against piercing the corporate veil.  *See Lumax Indus., Inc. v.*

*Aultman*, 669 A.2d 893, 895 (Pa. 1995).

However, in appropriate circumstances, the general rule is inapplicable, and a court may

pierce the corporate veil as "an equitable remedy [that] disregards 'the existence of a corporation

to make the corporation's individual principals and their personal assets liable for the debts of the corporation.'" *In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999) (quoting *In re Schuster*, 132 B.R. 604, 607 (Bankr. D. Minn. 1991)); *see also Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC*, 846 A.2d 1264, 1278 (Pa. Super. Ct. 2004).

No clear test exists for determining when the piercing of the corporate veil is appropriate. However, courts may consider a number of factors in making this determination, including, undercapitalization, failure to adhere to corporate formalities,[10] the insolvency of the entity, substantial intermingling of corporate and personal affairs, use of the corporate form to perpetrate a fraud, and circumstances that present an element of injustice or unfairness. *See Lumax*, 669 A.2d at 895; *Advanced Tel. Sys.*, 846 A.2d at 1278*; Schafer v. Charles Benjamin, Inc.*, Nos. 90-6225 and 91-6954, 1992 WL 59152, at *6-7 (E.D. Pa. Mar. 18, 1992); *Tr. Of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 140 F. Supp. 2d 407, 412-413 (E.D. Pa. 2001). These factors are not exhaustive, and the Pennsylvania Superior Court has more broadly stated:

> The general standard for piercing the corporate veil is as follows:
>
> > The legal fiction that a corporation is a legal entity separate and distinct from its shareholders was designed to serve convenience and justice, ... and will be disregarded whenever justice or public

---

[10] Although disregard of corporate formalities is a key factor in determining whether to pierce the veil of a corporation, this factor has more limited application in the context of a limited liability company. *See Trainer*, 204 F. Supp. 3d at 829 (citing *In re LMcD, LLC*, 405 B.R. 555, 561 (Bankr. M.D. Pa. 2009)). Indeed, Section 8106 of the Pennsylvania Uniform Limited Liability Company Act of 2016 states, in relevant part, "[t]he failure of a . . . limited liability company to observe formalities relating to the exercise of its powers or management of its activities and affairs is not a ground for imposing liability on a partner, member or manager of the entity for a debt, obligation or other liability of the entity." 15 Pa. Cons. Stat. Ann. § 8106. The Committee Comments to this section explain that in the context of limited liability companies, "the formalities at issue are the process formalities of governance – both those few created by this title and however few or many might be created by organic rules." *Id.* at Committee Comment, 2016.

> policy require and where rights of innocent parties
> are not prejudiced nor the theory of the corporate
> entity rendered useless. . . .We have said that
> whenever one in control of a corporation uses that
> control, or uses the corporate assets, to further his or
> her own personal interests, the fiction of the
> separate corporate identity may properly be
> disregarded.

> In deciding whether to pierce the corporate veil, courts are basically
> concerned with determining if equity requires that the shareholders'
> traditional insulation from personal liability be disregarded and with
> ascertaining if the corporate form is a sham, constituting a facade for
> the operations of the dominant shareholder.

*Vill. at Camelback Prop. Owners Ass'n, Inc. v. Carr*, 538 A.2d 528, 532-33 (Pa. Super. Ct. 1988)

(internal citations omitted)); *see also Power Line Packaging, Inc. v. Hermes Calgon/THG*

*Acquisition LLC*, No. 7-EDA-2016, 2017 WL 90617, at *30 (Pa. Super. Ct. Jan. 10, 2017)

(affirming trial court decision to pierce corporate veil of defendant limited liability company);

*Fletcher-Harlee Corp. v. Szymanski,* 936 A.2d 87, 101-02 (Pa. Super. Ct. 2007) (finding that trial

court's refusal to pierce the corporate veil was error where defendant's company was

undercapitalized, defendant failed to adhere to corporate formalities, defendant intermingled

corporate and personal affairs, and "[t]o shield such behavior with a guise of a corporation"

would result in injustice).  Finally, "[a]lthough an extraordinary remedy, piercing of the

corporate veil in Pennsylvania does not require a specific showing of fraud." *Hutchison*, 2011

WL 4482345 at *12 (citing *Camelback*, 538 A.2d at 533).

 Applying the above principles to this case, we conclude that the facts warrant, and justice

and equity demand, that we disregard Paselo's corporate form and find P. Scalleat and Franco

individually liable to Reivia for breach of contract.

 First, the record establishes that Paselo lacked sufficient capital to undertake the Huber

Breaker project or to repay the loan from Reivia.  A company is undercapitalized if it is unable to

"carry on its business." *Fletcher-Harlee*, 936 A.2d at 100 n. 17 (citing *Black's Law Dictionary* (8th ed. 2004)). We recognize that Paselo was in existence and its operations generated substantial revenue in the year before it acquired Huber Breaker. However, the testimony reflects that Paselo's scrap metal business yielded modest profits and was vulnerable to market fluctuations, and that the expenses for a project on the scale of Huber Breaker would be substantial. In fact, the expenses presented to Garner for approval during the 10 months of the project's operation totaled more than $1 million.

Paselo's undercapitalization is further revealed by the fact that it lacked the means to independently contribute even 10 percent of the Huber Breaker purchase price, as required under the Agreement. Paselo's principals had to resort to borrowing the money and then, within months, they reclaimed almost two-thirds of that contribution because they were experiencing personal financial pressure. Fairly early in the project, Paselo failed to pay all of its bills when they came due, and by the second quarter of 2014, the company had accumulated substantial unpaid invoices for equipment used at the project — bills which remained unpaid at the time of trial.[11]

Paselo also was unable to maintain the Huber Breaker site in compliance with environmental requirements or to timely satisfy various obligations, including municipal taxes due on the property. Public records reflect that Paselo owes Luzerne County a total of more than

---

[11]  Both P. Scalleat and Franco testified that although the unpaid invoices related to equipment owned or leased by Green Earth North, the expenses were attributable to work performed at the Huber Breaker site and were, ultimately, Paselo's obligation. (6/20/17 Tr. 72-73, 141-142.) If we credit their testimony, it amounts to an admission that they allowed Paselo to default on that obligation by, for example, agreeing to the early repayment of $600,000 on the Reivia loan at a time when Garner's insecurity about the project could have led to acceleration of the loan. On the other hand, if some or all of the expenses were, in fact, attributable to Green Earth North's business, it means Franco and P. Scalleat improperly attempted to use Paselo's assets to satisfy the obligations of an unrelated company in which Franco had a personal interest.

$78,000 in delinquent taxes for 2014, 2015 and 2016, and that Paselo is a defendant in several actions involving unpaid taxes, municipal liens, environmental non-compliance, and other delinquent obligations.  *See Luzerne Cty. Tax Claim Bureau v. Paselo Logistics, LLC,* No. 201705774 (Luz. Ct. Com. Pl.) (filed May 2, 2017); *Luzerne Cty. Tax Claim Bureau v. Paselo Logistics, LLC,* No. 201702413 (Luz. Ct. Com. Pl.) (filed May 2, 2017); *Wyoming Valley Sanitary Auth. v. Paselo Logistics, LLC*, No. 201602583 (Luz. Ct. Com. Pl.) (municipal lien action, filed March 15, 2016, for unpaid sewer charges from May 12, 2014 through Dec. 31, 2015); *Dep't of Envtl. Prot. v. Paselo Logistics, LLC*, No. 201601036 (Luz. Ct. Com. Pl.) (Petition to Enforce Compliance Order issued Feb. 26, 2015, filed Feb. 8, 2016); *Luzerne Bank v. Paselo Logistics, LLC*, No. 201513481 (Luz. Ct. Com. Pl.) (action for confession of $344,288 judgment for default on loan made on Jan. 3, 2014, filed Dec. 7, 2015); *Nat'l Constr. Rentals, Inc. v. Paselo Logistics, LLC,* No. 201606226 (Luz. Ct. Com. Pl.) (transfer of $17,957.40 judgment, filed June 9, 2016); *Souix Serv., LLC v. Paselo Logistics, LLC*, No. 14-20887 (Berks Ct. Com. Pl.) (debt collection action filed Oct. 31, 2014).

Second, Paselo's affairs — particularly its finances — were intermingled with those of its principals, P. Scalleat and Franco.  At the very outset of the project, P. Scalleat and Franco retained half the proceeds of a cash sale because they needed some personal cash.  Although the proceeds of the sale were relatively nominal, this was not an isolated occurrence, as P. Scalleat and Franco subsequently requested and received $80,000 of Paselo's funds to relieve their "financial personal pressure."  *See Lutyk*, 140 F. Supp. 2d at 414 (observing that the fact that defendant loaned money to the corporation and repaid the loans using corporate funds while the company was failing was evidence of undercapitalization); *Schaffer*, 1992 WL 59152, at *7

(piercing corporate veil where corporate president and sole stockholder used corporate funds to pay personal expenses).

Third, and notwithstanding the relative informality of limited liability companies, Paselo's disregard of "corporate formalities" was more significant than a mere failure to adhere to the process formalities imposed by statute or organic rules. *See* 15 Pa. Cons. Stat. Ann. § 8106, Committee Comment, 2016. The evidence at trial established that Paselo failed to keep, or retain in accessible form, important records such as employee tax documents and documentation of purchases and revenue. These are materials that one would expect a legitimate company to maintain, particularly when that company has agreed to give its lender access to its books and records. *See Schaffer*, 1992 WL 59152 at *7; *see also Plastipak Packaging, Inc. v. DePasquale*, 75 F. App'x. 86, 88-89 (3d Cir. 2003).

Under the circumstances of this case, we are satisfied that equity demands that we pierce Paselo's corporate veil and find P. Scalleat and Franco personally liable to Reivia for breach of contract.

### 3. *Defendants Failed To Prove Any Breach By Reivia*

In response to Reivia's Complaint, Defendants asserted a counterclaim against Reivia for breach of contract. Although the theory of Defendants' counterclaim is less than clear, they appear to assert: (1) that Reivia breached the Agreement "by failing to perform" and by taking the $600,000 partial repayment of its loan; and (2) that Reivia breached an alleged oral partnership agreement under which Defendants claim Reivia was obligated to pay all project expenses. (Defs.' Ans. ¶¶ 81-87, ECF Nos. 35; Defs.' Proposed Findings of Fact and Conclusions of Law at 45-51, ECF No. 118.) Defendants' breach of contract claim fails under either theory.

The record is devoid of any credible evidence that Reivia breached or failed to perform under the parties' Agreement. The Agreement obligated Reivia to extend a loan to Paselo for purchase of the Huber Breaker property. Reivia fully performed by lending Paselo $1,208,677. Under the terms of the Loan Agreement, Reivia was not obligated to pay the Huber Breaker project expenses. To the contrary, the Loan Agreement expressly required Paselo to, among other things: (a) promptly pay its undisputed debts to third parties, (Ex. P-1 § 6.12); (b) provide to Reivia and secure its approval of a detailed weekly budget, (*Id.* § 6.18); (c) indemnify Reivia against any claims, losses, liabilities and expenses incurred in connection with the Agreement and the parties' transactions, (*Id.* § 2.2.2); and, (d) pay all Reivia's expenses incurred in connection with the Agreement or Reivia's exercise of its rights thereunder. (*Id.* § 12.3.)

The revenue and expense management procedures subsequently agreed to by the parties did not impose additional expense payment obligations on Reivia. At most, those procedures required Reivia to use funds from the project revenue – if sufficient revenue existed – to pay the expenses that were submitted to and approved by Garner. Reivia did just that, and over the life of the project, Reivia authorized payment of, or directly paid, more than $1 million in project expenses. Reivia had no obligation to pay the outstanding equipment invoices – presented to Garner months after they were issued – because those expenses were disputed and Garner questioned, with some justification, whether those bills were attributable, at least in part, to Green Earth North rather than the Huber Breaker project.

The $600,000 partial loan repayment also did not constitute a breach of the Agreement by Reivia. First, the Loan Agreement permitted a voluntary prepayment of the loan with Reivia's approval. (*Id.* § 2.1.5.) Second, Paselo's principals did not object to the repayment. Finally, at the time of the partial repayment, Paselo had already breached some of its obligations under the

Agreement by failing to timely pay its debts and failing to give Garner access to the Paselo 1 account. Under these circumstances, combined with Garner's reasonable insecurity about the financial status of the project, Reivia likely would have had the right to accelerate the full balance of the loan.

Turning to Defendants' second theory, we find that Reivia did not enter into a partnership with Paselo. Pennsylvania law defines a partnership as "an association of two or more persons to carry on as co-owners of a business for profit." 15 Pa. Stat. and Cons. Stat. Ann. § 8422(a). Although a partnership agreement may be made orally, "there must be 'clear, mutual assent on the part of two or more persons' to form a partnership." *Leprino Foods Co. v. Gress Poultry, Inc.*, 379 F. Supp. 2d 650, 655 (E.D. Pa. 2005) (quoting *In re Jackson*, 28 B.R. 559, 562-63 (Bankr. E.D. Pa. 1983) and citing *Ruth v. Crane,* 392 F. Supp. 724, 733 (E. D. Pa. 1975)). In general, a person who shares in the profits of a business is presumed to be a partner; however, this presumption is inapplicable where the profits are received in payment of a debt. Pa. Stat. and Cons. Stat. Ann. § 8422(c)(3)(i). In determining whether an unwritten partnership agreement exists, courts consider "all of the attending circumstances." *Leprino*, 379 F. Supp. 2d at 655. "The burden of proof lies with the party or parties seeking to prove the existence of a partnership." *In re Jackson*, 28 B.R. at 563 (citing *Zuback v. Bakmaz*, 29 A.2d 473, 474 (Pa. 1943)).

Defendants contend that "Reivia and Paselo were to share in the profits generated as 50/50 partners" after the repayment of Reivia's loan and the payment of expenses approved by Reivia. (Defs.' Prop. Findings ¶ 70.) Defendants' argument is academic, and Reivia's right to receive a share of future profits was illusory, since Paselo failed to fully repay Reivia's loan or pay all project expenses. Paselo did not report or pay to Reivia any Excess Cash Flow, and the

only revenue Reivia received from the Huber Breaker project was $607,400 in partial repayment of Paselo's loan.

Having disposed of the "profit" issue, the circumstances here preclude a finding that there was the clear, mutual assent necessary to create an implied partnership. Defendants suggest that the parties formed the purported partnership and reached "a verbal agreement and mutual understanding concerning the operations of the [project] before the Loan Documents were executed in May of 2013." (*Id.* ¶ 65.) The only evidence offered in support of this theory is Defendants' testimony, which we do not find credible. In addition, it is incongruous, to say the least, for Defendants to argue that the parties *first* orally agreed to form a partnership, *then subsequently* decided to enter into a written agreement *expressly providing that*: "Lender is not the agent, fiduciary, partner or representative of, or member in, Borrower nor is Borrower the agent, fiduciary, partner or representative or, or member in, Lender. . . ." (Ex. P-1 § 12.9.)

## B.      Reivia Failed to Prove Conversion

Under Pennsylvania law, "[c]onversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification." *Conquest v. WMC Mortgage Corp.*, 247 F. Supp. 3d 618, 646 (E.D. Pa. 2017) (quoting *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 581 (Pa. Super. Ct. 2003)); *see also Chrysler Credit Corp. v. Smith,* 643 A.2d 1098 (Pa. Super. Ct. 1994). "Under Pennsylvania law, the required elements of a conversion claim are:  (1) the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, (2) without the owner's consent, and (3) without lawful justification." *Gabriel v. Giant Eagle, Inc.*, 124 F. Supp. 3d. 550, 573 (W.D. Pa. 2015) (citations omitted). "To establish conversion, the plaintiff must establish that the defendant wrongfully

took property from the plaintiff." *Conquest*, 247 F. Supp. 3d at 646. "Money may be the subject of conversion." *Francis J. Bernhardt, III, P.C. v. Needleman,* 705 A.2d 875, 878 (Pa. Super. Ct. 1997) (quotation omitted); *see also Peoples Mortg. Co., Inc. v. Fed. Nat'l Mortg. Ass'n*, 856 F. Supp. 910, 928 (E.D. Pa. 1994).

Reivia's conversion claim rests on Garner's comparison of the revenue he received and deposited in the Paselo 2 account against the customer records of payments made to Paselo during the Huber Breaker operation. Garner's comparison identified a total of $953,904.94 in payments from four customers that were made to Paselo during the Huber Breaker operation but were not provided to Garner for deposit into Paselo 2. More specifically, Garner summarized the total unreported payments, by customer, as follows: (1) EMR – $782,503.00; (2) Tabit – $66,848.00; (3) Weitsman – $54,363,35; and (4) Staiman – $50,190.59. (Ex. P51.) Based on Garner's analysis, Reivia assumes and believes that all the customer payments that were not reported to Garner were for material from the Huber Breaker site, and that Defendants concealed and diverted this revenue. (Tr. 6/19/17 at 128-130.)

Beyond its assumption and belief, the evidence that Reivia identifies in support of its conversion claim is scant and simply insufficient to establish that Paselo took property that Reivia owned or in which it had an interest. First, Reivia relies on a series of purported evidentiary omissions by Paselo, arguing that Paselo failed to prove that the disputed customer payments were not from the Huber Breaker site. (Pl.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 68-72, ECF No. 119; 10/10/17 Tr. 22, 25-26, 32-34.) In essence, Reivia contends that the existence of the unreported customer payments creates a presumption that those payments were diverted from Reivia, and that Paselo was then required to affirmatively disprove conversion.

Reivia's argument misconstrues the applicable burdens. It was Reivia's burden to provide this Court with evidence — not mere assumptions — sufficient to allow a reasonable factfinder to conclude that some or all of the unreported payments Paselo received were attributable to property that Reivia owned or in which Reivia had an interest. Plaintiff's complaint that Defendants failed to produce discovery relevant to this issue does not relieve Plaintiff of its burden. In addition, Plaintiff's argument ignores evidence that was in the record and that precludes a finding of liability on the conversion claim. That evidence includes: (1) the documentation of Paselo's scrap metal purchases before it acquired Huber Breaker; (2) records showing that Paselo made more than 500 sales to EMR alone in the year before the Huber Breaker project began; and (3) Kevin Boylan's testimony that several times per week, his company picked up full containers of metal for Paselo in Philadelphia. The above-noted evidence corroborates P. Scalleat's and Franco's testimony that Paselo operated its separate scrap metal business both before and during the Huber Breaker project. Reivia has provided nothing to rebut this.

Second, Reivia relies on the testimony of a Paselo employee, Jeremy Slizofsky, that he did not recall any "nonferrous metals" being brought to the Huber Breaker site from another location. (6/19/17 Tr. 138-139.) However, Slizofsky's testimony has little, if any, relevance to Reivia's conversion claim, and it is controverted by other evidence and testimony presented at trial. Slizofsky was a friend of P. Scalleat who worked at the Huber Breaker site periodically in some sort of "research and development" capacity. (*Id.* at 136-137.) Although Slizofsky occasionally delivered smaller scrap metal items to customers in his personal vehicle, he did not work full time at Huber Breaker and was at the site "at [his] convenience." (*Id.* at 138-139,

145.)  In short, Slizofsky did not testify about, nor was he in a position to know, the source of all scrap metal sold by Paselo during the Huber Breaker project.

In sum, although the record certainly reflects shortcomings in Paselo's record keeping and accounting practices, the evidence relied upon by Plaintiff falls short of the preponderance standard necessary for a fact finder to reasonably conclude that all or any of the unreported sales involved material from Huber Breaker.  As the plaintiff alleging conversion, it was Reivia's burden to prove that Defendants wrongfully took its property.  *Conquest*, 247 F. Supp. 3d at 646. Reivia failed to do so, and we cannot, without guess or conjecture, find Defendants liable for conversion.

### C.    Reivia Is Not Entitled To An Accounting

In Count III of its Complaint, Reivia requested, as a separate cause of action, "an accounting from defendants of all property removed from Huber Breaker and the proceeds of all property removed from Huber Breaker."  (Compl. ¶ 80.)  Plaintiff did not request an accounting as a remedy in the breach of contract and conversion claims alleged in Counts I and II, respectively.[12]  Although the Complaint did not specify whether Reivia sought an accounting at

---

[12]  Under Pennsylvania law, "the entitlement to an accounting may be legal or equitable." *Lightman v. Marcus*, No. 12-97, 2012 WL 1344378, at *3 (E.D. Pa. April 18, 2012). An equitable accounting is only appropriate when a fiduciary relationship exists between the parties, the plaintiff has alleged fraud or misrepresentation, the accounts are mutual and complicated, or the plaintiff does not possess an adequate legal remedy.  *Harold v. McGann*, 406 F. Supp. 2d 562, 578 (E.D. Pa. 2005) (citing *Rock. v. Pyle,* 720 A.2d 137, 142 (Pa. Super. Ct. 1998)).  Here, since Reivia's breach of contract claim provides an adequate remedy at law, it is not entitled to an equitable accounting.  *See Golkow v. Esquire Deposition Servs., LLC.*, No. 07-3355, 2009 WL 3030218, at *7 (E.D. Pa. Sept. 23, 2009) (holding that plaintiff was not entitled to an accounting sought in order to remedy the same damages alleged as part of her breach of contract claim).

law or in equity, Reivia subsequently stated, in response to Defendants' Motion to Dismiss, that it was entitled to a legal accounting.[13]  (Pl.'s Resp. at 24-26, ECF No. 23.)

The right to relief in the form of a legal accounting is "merely an incident to a proper assumpsit claim." *Greencort Condo. Ass'n v. Greencourt Partners,* No. 4045 Jan. Term 2004, 2005 WL 2562909, at *7 (Phila. Ct. Com. Pl. Oct. 4, 2005) (quoting *Buczek v. First Nat'l Bank*, 531 A.2d 1122, 1123 (Pa. Super. Ct. 1987)).  "Where there is an adequate remedy at law, an accounting – an equitable remedy – is not available as a substitute for damages." *Genica, Inc. v. Holophane Div. of Manville Corp.*, 652 F. Supp. 616, 619-20 (E.D. Pa. 1987) (citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962)); *see also Benefit Control Methods v. Health Care Servs., Inc.*, No. 97-4418, 1998 WL 22080, at *2 (E.D. Pa. Jan. 16, 1998);  *Centrix HR, LLC v. On-Site Staff Mgmt. Inc.*, No. 04-5660, 2008 WL 2265266, at *10-12 (E.D. Pa. June 3, 2008), *aff'd*, 349 Fed. Appx. 769, 774-775 (3d Cir. 2009).

Moreover, courts "will not grant a request for an accounting 'merely because the plaintiff desires information [it] could obtain through discovery.'" *Greencort*, *supra*, at *7 (quoting *Shared Comm. Servs. of 1800-80 JFK Blvd., Inc. v. Albert M. Greenfield & Co., Inc.*, No. 3417, 2001 WL 1807363 at *3 (Phila. Ct. Com. Pl. Nov. 19, 2001)); *see also Genica*, 652 F. Supp. at 619-20 ("An accounting should not be used to [aid] a party who has otherwise failed to satisfy his burden of proof on the damages issue."); *Golkow,* 2009 WL 3030218, at *6 ("[A]n accounting request is not a substitute for plaintiffs' obligation to establish their damages through discovery.") (citation omitted); *Centrix*, *supra*, at *11 (same); *Pennsylvania Ship Supply, Inc. v.*

---

[13]  According to Reivia, it sufficiently stated a claim for a legal accounting by alleging that:  (1) Paselo was responsible under the Agreement for the collection and distribution of monies received from the Huber Breaker project; and (2) Paselo's failure to provide Reivia a full accounting of its costs and fees constituted a breach of Paselo's duties under the Agreement. (Pl.'s Resp. at 25-26.)

*Fleming Int'l, Ltd.*, 113 F. Supp. 2d 760, 764 (E.D. Pa. 2000) (holding that plaintiff was not entitled to an accounting where the information sought was attainable through the discovery process).

Here, the evidence Reivia seeks by way of a post-trial accounting should have been obtained through the discovery process.[14]  As noted above, Reivia did, in fact, seek information and documents relating to Paselo's non-Huber Breaker business in depositions of Defendants and through written discovery requests.  However, when Defendants responded to those requests with objections and failed to produce responsive documents, Reivia took no further action.  We have reviewed the docket in this case, including Plaintiff's post-argument submission, and the record is devoid of any action taken by Reivia after its May 2015 Motion to Compel but before the trial to compel Defendants to produce information and documents related to their non-Huber Breaker business, or to seek sanctions against Defendants for their failure to provide the requested discovery.  Under these circumstances, Reivia is not entitled to an accounting.  *See, e.g., Centrix, supra*, at *11.

## D.  Attorneys' Fees and Costs

Having established Paselo's liability for breach of contract, the parties' Agreement entitles Reivia to recover its reasonable attorneys' fees and costs incurred in enforcing its rights under the Agreement.  (Ex. P-1 at ¶ 12.3.)  Although Reivia generally claims that it has incurred $450,000 in "expenses (including attorneys' fees and court costs)," this assertion is insufficient to establish the amount or reasonableness of the fees and costs that Plaintiff may recover.

---

[14]  It is unclear whether Reivia still seeks an accounting at this juncture.  In its proposed findings of fact and conclusions of law submitted July 28, 2017, Reivia stated that it is entitled to an accounting.  (Pl.'s Prop. Findings at 21.)  However, at the October 10, 2017 oral argument, when asked what relief Reivia seeks, its counsel outlined Reivia's alleged damages but did not request an accounting.  (10/10/17 Tr. 34-35.)

Accordingly, we will defer entry of an award of attorneys' fees and costs pending Reivia's submission of an application for the same.

IV.     CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Reivia and against Paselo, P. Scalleat and Franco on Plaintiff's claims for breach of contract, in favor of Reivia on Defendants' counterclaim for breach of contract, and in favor of Defendants on Reivia's conversion and accounting claims.  An appropriate order follows.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**